**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Keeley Anne Townsend, | No. CV-21-08129-PCT-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| Commissioner of Social Security Administration, | |
| Defendant. | |

Plaintiff challenges the denial of her application for disability and disability insurance benefits under Title II of the Social Security Act ("the Act") by the Commissioner of the Social Security Administration ("Commissioner"). Plaintiff filed a complaint with this Court seeking judicial review of that denial, and the Court now addresses Plaintiff's opening brief (Doc. 17), the Commissioner's answering brief (Doc. 18), and Plaintiff's reply (Doc. 19). The Court has reviewed the briefs and Administrative Record (Doc. 12, AR) and now reverses and remands for further proceedings.

## I.     PROCEDURAL HISTORY

On August 16, 2017, Plaintiff filed an application for disability and disability insurance benefits, alleging disability beginning on July 30, 2016. (AR at 13.) The Social Security Administration ("SSA") denied Plaintiff's application at the initial and reconsideration levels of administrative review and Plaintiff requested a hearing before an ALJ. (*Id.*) On December 2, 2020, following several hearings, the ALJ issued an unfavorable decision. (*Id.* at 13-29.) The Appeals Council later denied review.

1    **II.      THE SEQUENTIAL EVALUATION PROCESS AND JUDICIAL REVIEW**

2            To determine whether a claimant is disabled for purposes of the Act, the ALJ

3    follows a five-step process.  20 C.F.R. § 404.1520(a).  The claimant bears the burden of

4    proof on the first four steps, but the burden shifts to the Commissioner at step five.  *Tackett*

5    *v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).  At the first step, the ALJ determines whether

6    the claimant is presently engaging in substantial gainful activity.   20 C.F.R.

7    §404.1520(a)(4)(i).  At step two, the ALJ determines whether the claimant has a "severe"

8    medically determinable physical or mental impairment.  20 C.F.R. § 404.1520(a)(4)(ii).  At

9    step three, the ALJ considers whether the claimant's impairment or combination of

10   impairments meets or medically equals an impairment listed in Appendix 1 to Subpart P

11   of 20 C.F.R. Part 404.  20 C.F.R. § 404.1520(a)(4)(iii).  If so, the claimant is automatically

12   found to be disabled.  *Id.*  At step four, the ALJ assesses the claimant's residual functional

13   capacity ("RFC") and determines whether the claimant is still capable of performing past

14   relevant work.  20 C.F.R. § 404.1520(a)(4)(iv).  If not, the ALJ proceeds to the fifth and

15   final step, where she determines whether the claimant can perform any other work in the

16   national economy based on the claimant's RFC, age, education, and work experience.  20

17   C.F.R. § 404.1520(a)(4)(v).  If not, the claimant is disabled.  *Id.*

18           An ALJ's factual findings "shall be conclusive if supported by substantial

19   evidence."  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1153 (2019).  The Court may set aside

20   the Commissioner's disability determination only if it is not supported by substantial

21   evidence or is based on legal error.  *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007).

22   Substantial evidence is relevant evidence that a reasonable person might accept as adequate

23   to support a conclusion considering the record as a whole.  *Id.*  Generally, "[w]here the

24   evidence is susceptible to more than one rational interpretation, one of which supports the

25   ALJ's decision, the ALJ's conclusion must be upheld."  *Thomas v. Barnhart*, 278 F.3d 947,

26   954 (9th Cir. 2002) (citations omitted).  In determining whether to reverse an ALJ's

27   decision, the district court reviews only those issues raised by the party challenging the

28   decision.  *Lewis v. Apfel*, 236 F.3d 503, 517 n.13 (9th Cir. 2001).

**III.     THE ALJ'S DECISION**

The ALJ found that Plaintiff had not engaged in substantial, gainful work activity since the alleged onset date and that Plaintiff had the following severe impairments: cervical and lumbar degenerative disc disease; fibromyalgia; joint hypermobility syndrome; idiopathic hypotension/hypovolemia/dysautonomia orthostatic hypotension syndrome; and chronic migraine.  (AR at 16.)[1]  Next, the ALJ concluded that Plaintiff's impairments did not meet or medically equal a listing.  (*Id.* at 18-19.)  Next, the ALJ calculated Plaintiff's RFC as follows:

> [T]he claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a).  She can occasionally push and pull with bilateral upper extremities, and occasionally climb ramps and stairs, but can never climb ladders, ropes or scaffolds.  She can occasionally balance, stoop, and crouch, but can never kneel or crawl.  The claimant can occasionally reach overhead, and frequently handle and finger.  She must avoid bright sunlight, must be permitted to wear sunglasses when outdoors and working with fluorescent lighting.  She must also avoid loud noise, extreme temperatures, humidity, wetness, odors, fumes, and hazards, like moving machinery and unprotected heights.

(*Id.* at 19.)

As part of this RFC determination, the ALJ evaluated Plaintiff's symptom testimony, concluding that "[a]fter thorough review of the medical evidence of record, the undersigned establishes some basis for the claimant's alleged pain and limitations, although the extent of the claimant's alleged limitations is not fully supported." (*Id.* at 20-24.)  The ALJ also evaluated opinion evidence from 11 medical sources (two state agency reviewing physicians; nurse practitioner Theresa Dowell; David Saperstein, M.D.; Michael Lokale, D.O.; nurse practitioners Blaine Hendrick, Stephanie Ten Eyck, and Kathleen

---

[1]     The ALJ also found that Plaintiff had various non-severe impairments ("hepatic steatosis; osteopenia; acute gastritis/gastroenteritis; kidney stones and convergence insufficiency" and "anxiety disorder") and that several other alleged impairments ("chronic fatigue and immune dysfunction syndrome (CFIDS), postural orthostatic tachycardia syndrome (POTS), mast cell activation syndrome, neuropathy and malnutrition") were not medically determinable.  (AR at 16-18.)  The ALJ clarified that all of Plaintiff's impairments, as well as some of Plaintiff's symptoms arising from her non-determinable impairments, were considered when determining Plaintiff's RFC.  (*Id.* at 16-17.)

Hicks; chiropractors Wayne Bennett and M. Nash; and Karen Lunda M.S., P.T.).  (*Id.* at 25-26.)  Because Plaintiff does not challenge the ALJ's analysis with respect to most of these sources (Doc. 17 at 9 n.5), it is unnecessary to provide a fully summary here.

Based on the testimony of a vocational expert, the ALJ concluded that Plaintiff was capable of performing her past relevant work as an Enforcement Analysis Specialist, Operational Planning Analyst, Intelligence Ops Specialist, and Principal Specialist Intel Ops.  (*Id.* at 27.)  Additionally, the ALJ concluded that various "other jobs . . . exist in significant numbers in the national economy that [Plaintiff] can also perform," including document preparer, appointment setter, and receptionist.  (*Id.* at 27-28.)  Thus, the ALJ concluded that Plaintiff is not disabled.  (*Id.* at 28.)

## IV.    DISCUSSION

Plaintiff presents three issues on appeal: (1) whether the ALJ erred when discrediting the opinions of Dr. Saperstein; (2) whether the ALJ erred when discrediting the opinions of PT Lunda; and (3) whether the ALJ erred when discounting her symptom testimony.  As a remedy, Plaintiff seeks a remand without further administrative proceedings, other than calculation of benefits, pursuant to the credit-as-true test.

### A.    Dr. Saperstein

#### 1.    **Standard Of Review**

In January 2017, the SSA amended the regulations concerning the evaluation of medical opinion evidence.  *See Revisions to Rules Regarding Evaluation of Medical Evidence*, 82 Fed. Reg. 5844 (Jan. 18, 2017).  Because the new regulations apply to applications filed on or after March 27, 2017, they are applicable here.

The new regulations, which eliminate the previous hierarchy of medical opinions, provide in relevant part as follows:

> We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources . . . .  The most important factors we consider when we evaluate the persuasiveness of medical opinions and prior administrative medical findings are supportability . . . and consistency . . . .

20 C.F.R. § 416.920c(a).[2]   Regarding the "supportability" factor, the new regulations explain that the "more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s), . . . the more persuasive the medical opinions . . . will be." *Id.* § 404.1520c(c)(1).   Regarding the "consistency" factor, the "more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) . . . will be." *Id.* § 404.1520c(c)(2)

Recently, the Ninth Circuit confirmed that the "recent changes to the Social Security Administration's regulations displace our longstanding case law requiring an ALJ to provide 'specific and legitimate' reasons for rejecting an examining doctor's opinion." *Woods v. Kijakazi*, 32 F.4th 785, 787 (9th Cir. 2022).   Thus, "the former hierarchy of medical opinions—in which we assign presumptive weight based on the extent of the doctor's relationship with the claimant—no longer applies.   Now, an ALJ's decision, including the decision to discredit any medical opinion, must simply be supported by substantial evidence." *Id.*   With that said, "[e]ven under the new regulations, an ALJ cannot reject an examining or treating doctor's opinion as unsupported or inconsistent without providing an explanation supported by substantial evidence.   The agency must articulate how persuasive it finds all of the medical opinions from each doctor or other source and explain how it considered the supportability and consistency factors in reaching these findings." *Id.* at 792 (cleaned up).[3]

…

…

---

[2]   Other factors that may be considered by the ALJ in addition to supportability and consistency include the provider's relationship with the claimant, the length of the treatment relationship, the frequency of examinations, the purpose and extent of treatment relationship, and the specialization of the provider.   20 C.F.R. § 416.920c(c).

[3]   In her opening brief, which was filed before *Woods* was decided, Plaintiff argues that the new guidelines "do not abrogate the Ninth Circuit rules" regarding the evaluation of opinion evidence.   (Doc. 17 at 13-14.)   In her reply, which was filed after *Woods* was decided, Plaintiff acknowledges that *Woods* forecloses her position on this point but argues that "[t]he ALJ reasons for rejecting the assessments by [her] treating neurologist and examining physical therapist failed even considering the Ninth Circuit's abrogation of the specific and legitimate reasons standard."   (Doc. 19 at 5-6.)

2.    **The ALJ's Evaluation Of Dr. Saperstein's Opinions**

Dr. Saperstein issued several opinions regarding Plaintiff.  First, in a letter dated May 8, 2019, Dr. Saperstein wrote that Plaintiff had "numerous symptoms that evolve steadily," including "pain, fatigue, dizziness, headaches, nausea, vision disturbances, eye issues, photophobia, hyperacusis, temperature and vibration sensitivities, GI issues and pain and pelvic pain."  (AR at 1551 [record 46F].)  Based on these symptoms, Dr. Saperstein opined that Plaintiff "is clearly disabled and has extensive limitations.  She cannot sit for more than 15-30 minutes and requires frequent breaks.  She is not able to sit for more than 2 hours in a day.  Patient cannot stand for more than 15-30 mins at one time and no more than 2 hours in a day.  Pt cannot walk further than 500 yards without rest breaks every 20 mins; limited to no more than 1 hours total in a day without severe pain, subluxations and dislocations . . . .  Patent shows inability to work due to the inability to focus due to multiple disabling conditions.  Patient must take numerous days for her health as well as to be able to see the many medical providers for her disabling conditions."  (*Id.*)

Second, in a questionnaire entitled "Medical Assessment of Ability To Do Work-Related Physical Activities," which was completed in May 2019, Dr. Saperstein opined, *inter alia*, that Plaintiff had "Ehlers Danos Syndrome, Postural Orthostatic Tachycardia Syndrome, [and] Mast Cell Activation," as well as "severe pain, subluxations, fatigue, cognitive and memory issues, headaches, dizzy, weakness, nausea & more"; that Plaintiff could sit and stand/walk for less than two hours in an eight-hour workday; that Plaintiff could lift and carry less than 10 pounds; that Plaintiff would be off-task more than 21% of an eight-hour work day; and that Plaintiff would need to miss 6+ days of work per month.  (*Id.* at 1571-72 [record 49F].)  Dr. Saperstein offered the same opinions in another version of this questionnaire completed in November 2019.  (*Id.* at 1687-88 [record 61F].)

Third, in a letter dated August 10, 2020, Dr. Saperstein diagnosed Plaintiff with "Hypermobile Ehlers-danos syndrome," "Mast Cell Activation Syndrome, Unspecified," "Postural Orthostatic Tachycardia Syndrome," and "Chronic Migraine"; stated that Plaintiff's "medical conditions are complex and her diagnoses have evolved based on

symptom presentation, test results, and specific diagnostic criteria"; and opined, *inter alia*, that Plaintiff's "interest in, questions about, and attention to her medical conditions appear entirely appropriate" and "I have never witnessed anything that would make me suspect [Plaintiff] has a somatic/somatoform disorder." (*Id.* at 2077 [record 86F].)

The ALJ deemed Dr. Saperstein's opinions "unpersuasive." (*Id.* at 25.) The ALJ provided the following explanation for this determination:

> David Saperstein, M.D., completed multiple questionnaires and statement in which he opined she was unable to sustain employment (Ex. 46F, 49F, 61F & 86F). He stated she cannot sit or stand for more than 2 hours and can walk no more than 1 hour a day and that she passes out when standing due to POTS [Postural Orthostatic Tachycardia Syndrome] and can only perform postural activities and use her hands/feet up to 20% a day. Like Ms. Dowell's opinions, the limitations indicated by Dr. Saperstein are so extreme the claimant would essentially be bedridden and would reasonably display some weakness or atrophy of muscles, yet, the claimant's strength and gait is normal throughout the longitudinal medical record, with only very intermittent notations of an antalgic gait. Further, the provider's own limited treatment notes fail to identify any abnormal findings to support such extreme limitations (Exhibit 44F/13-15), but rather demonstrate her reluctance to follow recommended treatment (Ex. 82F). Thus, the undersigned finds these opinions unpersuasive.

(*Id.* at 25.)

### 3.   **The Parties' Arguments**

Plaintiff argues that the ALJ provided legally insufficient reasons for discrediting the opinions of Dr. Saperstein. (Doc. 17 at 14-17.) As for the first reason (diagnosis of being "essentially . . . bedridden" inconsistent with other medical records), Plaintiff argues that Dr. Saperstein did not diagnose her as bedridden and that the absence of certain symptoms (*e.g.*, muscular atrophy) in other medical records would not, at any rate, be a valid basis for discounting Dr. Saperstein's opinions. (*Id.* at 14-15.) As for the second reason (opinions not supported by treatment notes), Plaintiff contends that Dr. Saperstein's August 2020 letter identifies Plaintiff's various "diagnosed medical conditions," that records and notes from other treatment providers "support Dr. Saperstein's statements,"

and "[t]hat Dr. Saperstein's own records did not show the findings *the ALJ* expected does not invalidate Dr. Saperstein's assessments." (*Id.* at 15-16.)  As for the third reason (failure to follow treatment), Plaintiff acknowledges that  she did not follow one prescribed course of treatment (triptan medication for migraines) but argues that because she "was compliant with all other prescribed treatments" for other conditions, this one instance of non-compliance "does not invalidate the entirety of Dr. Saperstein's assessments." (*Id.* at 16-17.)  Plaintiff also notes that she pursued other treatments for migraines.  (*Id.*)

In response, the Commissioner argues that the Commissioner "properly found [Dr. Saperstein's] opinion unpersuasive based on the consistency and supportability factors." (Doc. 18 at 13-16.)   More specifically, the Commissioner states that Dr. Saperstein "frequently noted unremarkable exam findings, including normal gait and strength, and no muscle atrophy indicative of a sedentary and bedridden lifestyle," which findings "are certainly relevant to Dr. Saperstein's assertions that Plaintiff is essentially bedridden and can sit, stand, or walk less than 2 hours a day and perform other activities including with her hands only 20% a day." (*Id.* at 14-15.)  In a similar vein, the Commissioner notes that Dr. Saperstein assigned Plaintiff "a low Beighton score of 3 . . . [which] does not indicate JHS or EDS" and "noted no recurrent joint dislocations or frank instability" and argues that the ALJ thus "reasonably considered Dr. Saperstein's treatment notes when assessing whether this opinion was persuasive based on supportability."  (*Id.*)  Separately, the Commissioner argues that the ALJ properly discounted Dr. Saperstein's opinions based on the consistency factor in light of the evidence that Plaintiff refused to follow a recommended course of treatment for her migraines.  (*Id.* at 15-16.)

In reply, Plaintiff argues that the ALJ's first rationale was flawed because "the ability to sit or walk for two hours and stand or walk for two hours in an eight-hour workday does not equate to a finding that [Plaintiff] was 'bedridden'" and because "the ALJ did not provide citation to the record or a basis in substantial evidence for rejection of Dr. Saperstein's assessed limitations whether or not they are considered 'extreme'" (Doc. 19 at 6-7); that the Commissioner merely repeats the ALJ's rationale, which is different from

defending it (*id.* at 7); and that although Plaintiff does "not claim she was compliant with triptan medications" for her migraines, "the ALJ failed to acknowledge [Plaintiff's] legitimate reasons for her reluctance to take triptans for migraines and failed to acknowledge [Plaintiff's] efforts to comply with treatment and help herself with regard to all of her *other* impairments besides migraines" (*id.*).

4. **Analysis**

Applying the new regulations, the Court finds no error in the ALJ's evaluation of Dr. Saperstein's opinions.

One of the ALJ's reasons for discrediting Dr. Saperstein's opinions was that "the provider's own limited treatment notes fail to identify any abnormal findings to support such extreme limitations."  (AR at 25.)  The Court construes this as an invocation of the supportability factor, which is a permissible basis for discrediting a medical source's opinions.  *Woods*, 32 F.4th at 973 n.4 (contrasting a "supportability finding," which addresses whether the opinion was supported by "objective medical evidence and supporting explanations" from the source, with an inconsistency finding, which address whether the source's "opinion was inconsistent with other record evidence") (citations omitted).

The lack-of-supportability finding is supported by substantial evidence.  On October 19, 2018, Dr. Saperstein met with Plaintiff for 60 minutes and memorialized the meeting in a set of medical notes.  (AR 1473-87.)  The notes reflect that Dr. Saperstein performed an "objective" evaluation of Plaintiff and recorded various findings.  (*Id.* at 1483-86.) These findings were largely normal.  (*See, e.g.*, *id.* at 1485 ["Motor: There is normal muscle tone and bulk.  Strength symmetric and 5/5 throughout all muscles. . . .  Gait: Casual, heel, toe and tandem walking are normal."]; *id.* at 1486 ["no [r]ecurrent joint dislocations or frank instability, in the absence of trauma. . . .  Laboratory testing for mast cell activation syndrome negative."].)  It was rational for the ALJ to construe these normal findings as inconsistent with—and therefore unsupportive of—the opinions that Dr. Saperstein elsewhere expressed.  And "[w]here the evidence is susceptible to more than one rational

interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002).

Notably, Plaintiff does not appear to dispute that the clinical observations in Dr. Saperstein's treatment notes fail to support Dr. Saperstein's opinions—instead, Plaintiff argues that it is unnecessary to a medical source's own objective findings to support that source's opinions so long as there are supporting findings from other sources. (Doc. 17 at 15 [arguing that "[t]he records"—which are elsewhere identified as records from other medical sources—"support Dr. Saperstein's statements" and "[t]hat Dr. Saperstein's own records did not show the findings *the ALJ* expected does not invalidate Dr. Saperstein's assessments"].) This argument fails because it conflates the supportability and consistency factors. *Woods*, 32 F.4th at 793 n.4 ("The ALJ described Dr. Causeya's opinion as 'not supported by' the record, but the ALJ plainly did not intend to make a supportability finding. . . . Rather, the ALJ meant only that Dr. Causeya's opinion was inconsistent with other record evidence. Although the ALJ's meaning here is clear from context, to avoid confusion in future cases, ALJs should endeavor to use these two terms of art—'consistent' and 'supported'—with precision."). Nor does *Orn v. Astrue*, 495 F.3d 625 (9th Cir. 2007), support Plaintiff's position. There, the Ninth Circuit explained that "[t]he primary function of medical records is to promote communication and recordkeeping for health care personnel—not to provide evidence for disability determinations. We therefore do not require that a medical condition be mentioned in *every* report to conclude that a physician's opinion is supported by the record." *Id.* at 634 (emphasis added). But here, the issue is not that Dr. Saperstein only made abnormal clinical findings and observations during some of his examinations of Plaintiff, but not others. Rather, the issue is that Plaintiff has not identified *any* instance where Dr. Saperstein made abnormal clinical findings and observations that would support his opinions. It was therefore rational for the ALJ to conclude that the supportability factor undermined Dr. Saperstein's opinions and to discredit Dr. Saperstein's opinions on that basis.

Another of the ALJ's reasons for discrediting Dr. Saperstein's opinions was that

Plaintiff failed to follow a recommended course of treatment for her migraines.  (AR at 25.)  Plaintiff does not dispute the factual accuracy of this assertion—she simply notes that she followed other treatment recommendations and questions whether a single failure to follow a prescribed course of treatment qualifies as a legally valid basis for discrediting a medical source's opinion.

As discussed in Part IV.C below, the law is clear that a claimant's unexplained or inadequately explained failure to follow a prescribed course of treatment is a permissible basis for discrediting the *claimant's* symptom testimony.  It is less clear whether such conduct also provides a valid basis for discrediting a *medical source's* opinion.  Neither side identifies a Ninth Circuit decision supporting its position on this issue and the Court's own research suggests that lower courts have reached differing conclusions.[4]

It is unnecessary to resolve this unsettled issue here for two reasons.  First, as discussed above, the ALJ identified another legally valid reason, supported by substantial evidence, for discrediting Dr. Saperstein's opinions.  Thus, any error with respect to the ALJ's other reasons was harmless.  *See, e.g., Reed v. Saul*, 834 F. App'x 326, 329 (9th Cir. 2020) ("To the extent the ALJ erred in discounting the opinions of Dr. Cochran because her opinions were based in part on Reed's self-reports of his symptoms, that error is harmless because the ALJ offered multiple other specific and legitimate reasons for discounting Dr. Cochran's opinions."); *Baker v. Berryhill*, 720 F. App'x 352, 355 (9th Cir. 2017) ("Two of the reasons the ALJ provided for discounting examining psychologist Dr. Wheeler's opinion were not legally valid . . . [but] Baker has not shown these errors affected the ALJ's ultimate nondisability determination, as the ALJ provided other specific and legitimate reasons for discounting Dr. Wheeler's opinion . . . .  As a result, any error was harmless."); *Presley-Carrillo v. Berryhill*, 692 F. App's 941, 944-45 (9th Cir. 2017)

---

[4]    *Compare Tatyana K. v. Berryhill*, 2019 WL 464965, *8 (D. Or. 2019) ("A claimant's failure to follow a prescribed course of treatment can provide a specific and legitimate reason for discounting a physician's opinion.") *with Nathan S. v. Saul*, 2020 WL 1916175, *9 (E.D. Wash. 2020) ("An ALJ may discredit a claimant's symptom complaints if the claimant fails to show good reason for failing to follow treatment recommendations. However, the fact that a claimant fails to pursue treatment is not directly relevant to the weight of a medical provider's opinion.  The lack of treatment may be considered as a part of the opinion's consistency with the record as a whole.") (citations omitted).

("The ALJ also criticized Dr. Van Eerd's opinion in part because Dr. Van Eerd did not define the terms 'mild,' 'moderate,' or 'severe' in his assessment.  This criticism was improper . . . [but] this error was harmless because the ALJ gave a reason supported by the record for not giving much weight to Dr. Van Eerd's opinion—specifically, that it conflicted with more recent treatment notes from Dr. Mateus."). *Cf. Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1162-63 (9th Cir. 2008) ("Because we conclude that two of the ALJ's reasons supporting his adverse credibility finding are invalid, we must determine whether the ALJ's reliance on such reasons was harmless error. . . .  [T]he relevant inquiry in this context is not whether the ALJ would have made a different decision absent any error, it is whether the ALJ's decision remains legally valid, despite such error. . . .  Here, the ALJ's decision finding Carmickle less than fully credible is valid, despite the errors identified above.").[5]  Second, and alternatively, the Court has determined in Part IV.B below that the ALJ committed reversible error with respect to a different issue—the evaluation of PT Lunda's opinions.  This, too, makes it unnecessary to delve further into the sufficiency of the ALJ's "failure to follow treatment" rationale for discrediting Dr. Saperstein's opinions.

…

---

[5]      With that said, the Court notes that the ALJ's final rationale for discrediting Dr. Saperstein's opinions—that, because Dr. Saperstein had "essentially" diagnosed Plaintiff as bedridden, one would "reasonably" expect Plaintiff's "longitudinal medical record" to contain evidence of muscle weakness or atrophy, yet the medical record contained no such evidence (AR at 25)—was likely erroneous.  Dr. Saperstein did not diagnose Plaintiff as essentially bedridden.  To the contrary, Dr. Saperstein opined that Plaintiff could sit, stand, and walk, albeit only for relatively short periods interspersed with breaks.  Although Dr. Saperstein's opined-to physical limitations may have been quite restrictive, they still fell short of portraying Plaintiff as bedridden.  Additionally, the ALJ did not provide a sufficient foundation for the assertion that one would "reasonably" expect a patient with Dr. Saperstein's opined-to limitations to suffer from muscle atrophy and weakness.  If Dr. Saperstein had truly diagnosed Plaintiff as being bedridden, perhaps this expectation would be so obvious as to not require a foundation in the record, but that was not Dr. Saperstein's diagnosis.  It is therefore unclear why the ALJ was qualified to opine about the sorts of muscle-related diagnoses that should "reasonably" be found in Plaintiff's other medical records.  *Cf. Rawa v. Colvin*, 672 F. App'x 664, 667 (9th Cir. 2016) ("[T]he ALJ rejected Rawa's testimony regarding her debilitating pain because she did not show signs of muscle atrophy in her spine.  Without citing any medical finding or opinion in the record, the ALJ opined that 'muscle atrophy is a common side effect of prolonged and/or chronic pain,' and concluded that Rawa's pain testimony was less than credible because she did not exhibit such atrophy.  It is beyond the scope of the ALJ's authority to offer such a medical opinion based solely on his own personal speculation.").

1

    B.    PT Lunda

2

        1.    **Standard Of Review**

3

    As discussed above, because Plaintiff filed her application after March 2017, the

4

ALJ's evaluation of all of the opinion evidence (including the opinions of PT Lunda) is

5

governed by the new regulations.

6

        2.    **The ALJ's Evaluation Of PT Lunda's Opinions**

7

    On December 18 and 19, 2017, PT Lunda performed a functional capacity

8

evaluation of Plaintiff.  (AR at 973.)  The results of this evaluation were memorialized in

9

a summary report dated December 19, 2017.  (*Id.* at 973-93.)  Among other things, PT

10

Lunda opined that Plaintiff could lift, carry, push, and pull up to 13 pounds for 5% of the

11

day; could sit occasionally with position changes; could stand and walk "on a rare basis

12

and in the occasional category if performed with positional/activity changes allowed as

13

needed although [Plaintiff] will not tolerate fully up to 33% of a work day for either"; could

14

perform elevated work, forward bending, and partial squatting on a rare basis; could climb

15

stairs, limited to two flights twice a day; could occasionally use her hands for gripping and

16

fine motor work; and could not lift below knee level, above crown level, or with one hand.

17

(*Id.* at 985-86.)

18

    The ALJ deemed PT Lunda's opinions "not . . . highly persuasive."  (*Id.* at 26.)  The

19

ALJ provided the following explanation for this determination:

20

21

22

23

24

25

26

27

28

> Karen Lunda M.S., P.T., completed a functional capacity evaluation (Ex. 25F), after which the examiner opined the claimant could lift, carry, push, pull up to 13 pounds 5% of the day, could sit occasionally with position changes, stand and walk on a rare-occasional basis (up to 33% of the workday) but total time on her feet limited to 1.5 hours as well as limit elevated work, squatting, gripping and fine motor work and no lifting below knee level.  The undersigned notes the examination revealed primarily subjective complaints aside from decreased functional strength in the bilateral lower extremities, decreased grip strength, edema at the knees, joint hypermobility in the fingers, knees, and shoulders, and variances in ranges of motion, which is not consistent with the level of limitation indicated by Ms. Lunda.  While the undersigned finds it reasonable the claimant does indeed have limitations, those indicated by Ms. Lunda do not align and are

inconsistent with the other evidence of record.  Thus, this opinion is not found highly persuasive.

(*Id.*)

### 3.   **The Parties' Arguments**

Plaintiff argues that the ALJ's reasons for rejecting PT Lunda's opinions were insufficient.  (Doc. 17 at 17-18.)  More specifically, Plaintiff argues that the ALJ's first reason ("aside from symptoms that confirmed [Plaintiff's impairments], . . . PT Lunda did not observe any problems") was circular and does not address supportability or consistency and that the ALJ's second reason ("inconsistent with the record") was flawed because the ALJ did not identify the supposedly conflicting evidence and "a reviewing Court should not be countenanced to search through an administrative record to find evidence to support an ALJ's reasoning."  (Doc. 17 at 17-18.)

In response, the Commissioner defends the sufficiency of the ALJ's reasoning. (Doc. 18 at 16-17.)  The Commissioner's argument is as follows: "Substantial evidence supports the ALJ's reasoning.  As discussed above, the overall evidence of record, including the mostly normal exam findings, the relatively conservative nature of her treatment, and the opinions of agency medical experts in disability evaluation, were inconsistent with, and unsupportive of, Ms. Lunda's assigned limitations.  Notably, the ALJ accounted for any abnormal findings, including Plaintiff's subjective complaints to a large extent, by restricting her to the most restrictive of all work categories—sedentary work—with additional limitations. Plaintiff's assertions that the record warranted additional limitations have no merit and this Court should reject those arguments."  (*Id.*)

In reply, Plaintiff accuses the Commissioner of failing to "meaningfully respond" to her arguments concerning PT Lunda.  (Doc. 19 at 7-8.)  Plaintiff notes that "[t]he Commissioner did not explain the ALJ's finding that even though PT Lunda assessed findings that were consistent with the record, PT Lunda's assessment was still invalid. Neither the ALJ nor the Commissioner provided reasons germane to PT Lunda's assessment for rejecting PT Lunda's assessed limitations."  (*Id.*)

4.   **Analysis**

The Court agrees with Plaintiff that the ALJ provided legally insufficient reasons for discrediting the opinions of PT Lunda.

The ALJ's first proffered reason was that "the examination revealed primarily subjective complaints aside from decreased functional strength in the bilateral lower extremities, decreased grip strength, edema at the knees, joint hypermobility in the fingers, knees, and shoulders, and variances in ranges of motion, which is not consistent with the level of limitation indicated by Ms. Lunda." (AR at 26.)  This is best understood as a concern over supportability.  Although a lack of supportability is, in general, a valid basis for discrediting a medical source's opinion, the problem here is that the ALJ's supportability explanation is conclusory and not supported by substantial evidence.  The ALJ did not identify any clinical observations by PT Lunda that were *in*consistent with PT Lunda's opined-to limitations.  Additionally, the ALJ acknowledged that PT Lunda made a variety of abnormal clinical observations related to Plaintiff's lower extremities, grip strength, knees, fingers, and shoulders that, presumably, *could* support the opinion that Plaintiff has functional limitations arising from those conditions.  The ALJ's determination of unsupportability was therefore inadequately explained.  *Cf. Lopez v. Colvin*, 194 F. Supp. 3d 903, 915 (D. Ariz. 2016) ("It is true that [the treating physician] notes consistently report a normal musculoskeletal examination, except for bilateral knee pain, general myalgia, and decreased range of motion of the lumbar and cervical spine.  But the ALJ does not explain why bilateral knee pain, general myalgia, and decreased range of motion of the lumbar and cervical spine are insufficient to support the limitations assessed in [the treating physician's] opinions."); *Cervi v. Comm'r of Soc. Sec. Admin.*, 2022 WL 621765, *3 (D. Ariz. 2022) ("The ALJ fails to meaningfully explain how these findings [from Dr. Rakkar's own treatment notes] were 'not substantially consistent' with Dr. Rakkar's opinions. . . .  This failure is particularly notable because the examinations and treatment notes to which the ALJ refers could plausibly be read to *support* the limitations Dr. Rakkar found—after all, each of these allegedly inconsistent examinations nonetheless noted back

pain and decreased ranges of motion.  Without a more substantive explanation from the ALJ . . . this Court cannot find that the ALJ's discrediting of Dr. Rakkar's opinions is supported by substantial evidence.") (citations omitted).

The ALJ's other proffered reason for discrediting PT Lunda's opinions was that they "do not align and are inconsistent with the other evidence of record."  (AR at 26.)  This is best understood as a concern over consistency.  Although a lack of consistency with other medical evidence in the record is, in general, a valid basis for discrediting a medical source's opinion, the problem once again is that the ALJ's explanation is conclusory and not supported by substantial evidence.  The ALJ did not identify any specific piece of medical evidence in the record that contradicted PT Lunda's opinions.  Instead, the ALJ simply offered a non-specific reference to the entirety of the record, which spans over 2,100 pages.  This is legally insufficient.  *Cf. Boyd v. Comm'r of Soc. Sec. Admin.*, 2022 WL 3152492, *5 (D. Ariz. 2022) ("[T]his could have been a permissible explanation for why Dr. Tran's opinion was being discounted under the 'consistency' factor if the ALJ had gone further and identified specific portions of 'the record' that demonstrated a lack of consistency.  But the ALJ . . . did not do so.  Thus, the reader is left to guess where in 'the record'—which spans over 1,100 pages—the evidence of the inconsistency might be found.  Although the Commissioner again attempts to fill this void in the answering brief, by identifying various medical records that could be viewed as establishing inconsistency, it was the ALJ's responsibility to identify such records in the first instance.  On remand, an ALJ may very well agree with the Commissioner that the cited records establish a lack of . . . consistency, but this possibility does not undermine the conclusion that reversal is required.") (citations omitted).

C.     Symptom Testimony

1.     **Standard Of Review**

An ALJ must evaluate whether the claimant has presented objective medical evidence of an impairment that "could reasonably be expected to produce the pain or symptoms alleged."  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035–36 (9th Cir. 2007)

(citations omitted).  In evaluating a claimant's pain testimony after a claimant produces objective medical evidence of an underlying impairment, "an ALJ may not reject a claimant's subjective complaints based solely on a lack of medical evidence to fully corroborate the alleged severity of pain." *Burch v. Barnhart*, 400 F.3d 676, 682 (9th Cir. 2005).  Instead, the ALJ may "reject the claimant's testimony about the severity of [the] symptoms" only by "providing specific, clear, and convincing reasons for doing so." *Brown-Hunter v. Colvin*, 806 F.3d 487, 488–89 (9th Cir. 2015).

### 2.  **The ALJ's Evaluation Of Plaintiff's Symptom Testimony**

During the hearing, Plaintiff testified that she is unable to work due to a number of conditions, including migraine headaches and joint hypermobility; that she spends the majority of each day in bed or in a recliner; and that she has no hobbies or anything else that she likes to do for fun.  (AR at 56-78.)

The ALJ concluded that "[a]fter thorough review of the medical evidence of record, the undersigned establishes some basis for the claimant's alleged pain and limitations, although the extent of the claimant's alleged limitations is not fully supported."  (AR at 21.)  The ALJ then provided various reasons for discounting Plaintiff's symptom testimony in this fashion.

As for Plaintiff's allegations regarding joint hypermobility syndrome (or EDS), the ALJ identified various test and examination results that suggested that although Plaintiff had "some features of joint hypermobility, often seen in the context of hypermobility syndromes, [she] does not meet the criteria for EDS"—and, thus, Plaintiff has "at least some ability to perform exertional, postural, and manipulation activities" and any limitations could be addressed in the RFC.  (*Id.* at 21-22.)

Next, with respect to Plaintiff's allegations regarding migraines, the ALJ identified the following reasons for discrediting her testimony: (1) "[Plaintiff] elected not to follow the recommendations of numerous providers with regard to migraine treatment"; (2) "while [Plaintiff] has alleged that talking is too strenuous, this allegations are unsupported by the objective and clinical evidence of record, including her ability to speak at length during her

hearing"; and (3) and "in July 2020, [Plaintiff] said that she has only one severe migraine headache per year that can last one to two days . . . .  She also reported primary stabbing headaches that over the previous four months that 'are not debilitating' given that they last seconds once every one to two months."  (*Id.* at 22.)  Thus, the ALJ concluded that any migraine-related limitations could be addressed through the RFC.  (*Id.*)

Next, with respect to Plaintiff's allegations regarding dysautonomia (or orthostatic hypotension syndrome), the ALJ did not seem to discount Plaintiff's testimony but, rather, stated that given "the limited [alleged] nature of these headaches," the RFC's "limitation to sedentary exertion level, limited postural activities, and avoidance of hazards is sufficient to account for the claimant dysautonomic dysfunction."  (*Id.* at 22-23.)

Next, with respect to Plaintiff's allegations regarding "whole body pain" (or fibromyalgia), the ALJ seemed to accept Plaintiff's testimony— "given that [Plaintiff] made consistent complaints of fatigue, waking unrefreshed, intermittent constipation and diarrhea, as well as some reports of anxiety and depression consistent with fibromyalgia, the undersigned has found it a severe medically determinable impairment"—and simply determined that the limitations in the RFC "sufficiently account for her fibromyalgia symptoms."  (*Id.* at 23.)

Finally, with respect to Plaintiff's allegations regarding neck and back pain, the ALJ identified the following reasons for discrediting her testimony: (1) "while [various] imaging studies document some abnormality, there is no indication of central canal compromise nor were there any other objective findings consistent with the level of pain [Plaintiff] has alleged"; (2) "physical examinations with regard to the spine were relatively unremarkable"; (3) Plaintiff's "treatment history of her neck and back underscore the rather benign findings," and "[t]he lack of treatment beyond medication for generalized pain suggests that [Plaintiff's] back and neck impairments are not as disabling as alleged"; and (4) "[t]he frequently normal physical examinations and conservative treatment are not consistent with [Plaintiff's] assertions that she must stay in bed or in a recliner for the majority of the day, lacks the strength to wash her hair more than a couple times a week,

and is unable to perform basic household chores apart from dusting.  Indeed, with the degree of inactivity and disability alleged by [Plaintiff], one would expect more significant findings such as muscle weakness or atrophy, abnormal neurological findings such as the loss of sensation, or the need to use an assistive device."  (*Id.* at 23-24.)

### 3.  **Plaintiffs' Arguments**

Plaintiff argues that the ALJ failed to provide legally sufficient reasons for discrediting her symptom testimony.  (Doc. 17 at 20-24.)  Plaintiff argues that the ALJ applied the wrong standard (*id.* at 21-22); merely summarized the medical records without explaining, with specificity, why they were inconsistent with her testimony (*id.* at 22); placed undue emphasis on her failure to follow a prescribed course of treatment for migraines, which failure was justified by her concern that the prescribed medication would cause blood clots and autonomic dysfunction (*id.*); improperly faulted her for pursuing a conservative course of treatment without "explain[ing] what other course of treatment the ALJ thought [she] should have had for her impairments" (*id.* at 22-23); and improperly (and speculatively) provided his own medical opinion as to the symptoms (*e.g.,* muscle atrophy) that would be expected of a person with her limitations (*id.* at 23-24).

### 4.  **Analysis**

Although the Commissioner addresses all of Plaintiff's criticisms in the response brief (Doc. 18 at 5-12), the Court finds one of the Commissioner's arguments dispositive and thus does not address the rest.

Plaintiff failed to follow various recommended courses of treatment for her migraine headaches.  For example, in a clinical note written following a December 2016 visit with Plaintiff, Dr. VanderPluym wrote: "In discussion with [Plaintiff], it appears that she has never tried triptans which are migraine specific acute therapies.  I have provided her with a prescription for frovatriptan which is a long-acting but slow-onset triptan . . . .  She may also be a good candidate for Botox therapy . . . .  In the future, alternative medication trials that could be considered at low doses would include things like Cymbalta or gabapentin . . . ."  (AR at 755.)  Later, in a clinical note written following a July 2017 follow-up visit,

Dr. VanderPluym wrote: "Since last being seen Mr. Townsend reports daily headaches . . . . Patient was prescribed frovatriptan but has not tried it." (*Id.* at 810.) Later in the note, Dr. VanderPluym added: "From an acute treatment standpoint, I have advised [Plaintiff] to trial the frovatriptan even though she does not believe that her current headaches are her full-blown migraine with aura." (*Id.* at 812.) Dr. Saperstein, too, recommended in July 2020 that Plaintiff take triptan to treat her migraines and "reassured her" when she raised concerns about potential side effects. (*Id.* at 1843.)

Separately, in August 2017, a different doctor (Dr. Lokale) offered Plaintiff a different prescription drug for her migraines: "prescribe[d] topiramate 25mg a day for one week then increase to 25 mg twice a day." (*Id.* at 1609.) More than a year later, in December 2018, another doctor (Dr. Mohindra) recommended the same drug: "On the top of her complaint list is migraine headaches. . . . I would recommend Topomax twice daily for maintenance of migraine headaches." (*Id.* at 1542.)[6] Nevertheless, during a subsequent visit with a different doctor, Plaintiff admitted that she had failed to follow these recommendations. (*Id.* at 1837 [April 2, 2020 medical note: "has not tried any migraine prophylactic other than nortiptyline"].)

During the hearing, Plaintiff was asked a series of questions regarding her attempts to take migraine medications. (*Id.* at 56-57.) Her answers can be summarized as follows: (1) she was prescribed Sumatriptan for acute episodes, but she has only taken it once and was advised "to be very careful" about taking it; (2) she was given "the Cefaly device" but it "made them worse, so they just switched me to the Nerivio device," which she hasn't tried yet; (3) she takes magnesium; (4) she was prescribed two drugs, "Aimovig and Ajovy," "recently this year" but both prescriptions were subsequently cancelled due to concerns over side effects; and (5) she was subsequently prescribed Nexium, but "as of yesterday, they're holding off on that . . . [and] thinking droxibiltal." (*Id.*)

Against this backdrop, it was permissible for the ALJ to discredit Plaintiff's symptom testimony based on her failure to follow migraine-related treatment

---

[6]      The ALJ clarifies that topiramate and Topomax are the same thing. (AR at 19.)

recommendations.   The Ninth Circuit has "long held that, in assessing a claimant's credibility, the ALJ may properly rely on unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment.  According to agency rules, the individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure.  Moreover, a claimant's failure to assert a good reason for not seeking treatment, or a finding by the ALJ that the proffered reason is not believable, can cast doubt on the sincerity of the claimant's pain testimony." *Molina v. Astrue*, 674 F.3d 1104, 1113-14 (9th Cir. 2012) (cleaned up).  *See also Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989) ("There must . . . be some types of evidence capable of being introduced at a hearing on which an ALJ can rely to find a pain allegation incredible. . . .  [One] such form of evidence is an unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment. While there are any number of good reasons for not doing so, a claimant's failure to assert one, or a finding by the ALJ that the proffered reason is not believable, can cast doubt on the sincerity of the claimant's pain testimony.") (citations omitted).

Here, there is evidence that Plaintiff failed to follow at least two different recommended courses of treatment: (1) Dr. VanderPluym's recommendation to take frovatriptan, which was first made in December 2016 and repeated in July 2017 (and then reiterated by Dr. Saperstein in July 2020); and (2) the separate recommendations by Dr. Lokale (August 2017) and Dr. Mohindra (December 2018) to take topiramate/ Topomax. Additionally, Plaintiff has not identified any reason—let alone a good reason—for failing to follow these recommendations.  Although Plaintiff testified during the hearing that she had stopped taking and/or been advised not to take certain *other* migraine medications (Cefaly, Aimovig, and Ajovy) due to actual and/or potential side effects, she offered no testimony to that effect with respect to the recommendations to take frovatriptan and topiramate/Topomax.  Thus, the ALJ was entitled to discredit her testimony based on her

- 21 -

unjustified failure to follow treatment recommendations.  This determination, in turns, makes it unnecessary to review the sufficiency of the ALJ's additional reasons for discrediting Plaintiff's symptom testimony.  *Carmickle,* 533 F.3d at 1162-63.

D.    Credit-As-True

Plaintiff asks the Court to apply the credit-as-true rule, which would result in a remand for calculation of benefits rather than for further proceedings.  (Doc. 17 at 24-25.)

The credit-as-true rule determines whether a case should be remanded for benefits. *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014).  It applies if each part of a three-part test is satisfied.  *Id.*  First, the record must have been fully developed and further administrative proceedings would serve no useful purpose.  *Id.*  Next, the ALJ must have failed to provide sufficient reasons for rejecting the claimant's testimony or medical opinions.  *Id.*  Finally, if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled.  *Id.*  Even if all elements of the credit-as-true rule are met, the Court maintains "flexibility to remand for further proceedings when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act."  *Id.* at 1021.

In this case, the ordinary remand rule applies.  Further proceedings would be useful to enable to ALJ to address, in more detail, whether there is a valid basis for rejecting NP Lunda's opinions.  The Court notes that it would reach the same conclusion even if Plaintiff had established the existence of reversible error with respect to the ALJ's evaluation of Dr. Saperstein's opinions—any error stemming from a failure to provide a sufficiently detailed explanation, or to identify supporting evidence in the record, could be addressed through further proceedings.

…

…

…

…

…

**IT IS THEREFORE ORDERED** that the decision of the Commissioner of Social Security is **reversed and remanded for further proceedings**.  The Clerk is directed to enter judgment accordingly.

Dated this 16th day of August, 2022.

_____
Dominic W. Lanza
United States District Judge
